

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-25-2001

# Cinicola v. Scharffenberger

Precedential or Non-Precedential:

Docket 00-3318

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Cinicola v. Scharffenberger" (2001). *2001 Decisions.* Paper 90.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/90

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 25, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-3318

JOHN CINICOLA;
BONNIE K. CASE; PHILIP F. RABINOWITZ;
MICHAEL FARRELL; MICHELE R. MATHEWS-MLAKAR;
MARSHA FINO; ELLIOT SMITH; HUBERT SHICK
t/d/b/a NORTH ALLEGHENY INTERNAL MEDICINE,
        Appellants

v.

WILLIAM J. SCHARFFENBERGER, CHAPTER 11
TRUSTEE, et al.;
ALLEGHENY GENERAL HOSPITAL;
WESTERN PENNSYLVANIA HEALTHCARE SYSTEM, INC.

On Appeal from the United States District Court
for the Western District of Pennsylvania
D.C. Civil Action No. 99-cv-01327
(Honorable Gary L. Lancaster)

Argued September 13, 2000

Before: SLOVITER, SCIRICA and ALITO, Cir cuit Judges

(Filed: April 25, 2001)

WILLIAM H. SCHORLING, ESQUIRE
 (ARGUED)
Klett, Rooney, Lieber & Schorling
Two Logan Square, 12th Floor
18th and Arch Streets
Philadelphia, Pennsylvania 19103

EDWIN L. KLETT, ESQUIRE
Klett, Rooney, Lieber & Schorling
One Oxford Centre, 40th Floor
Pittsburgh, Pennsylvania 15219

 Attorneys for Appellants

DAVID I. SWAN, ESQUIRE
 (ARGUED)
MARK E. FREEDLANDER, ESQUIRE
McGuireWoods
Frick Building, 7th Floor
437 Grant Street
Pittsburgh, Pennsylvania
 15219-6002

 Attorneys for Appellee,
William J. Scharffenberger ,
Chapter 11 Trustee, et al.

JOHN P. EDGAR, ESQUIRE
 (ARGUED)
GARY P. NELSON, ESQUIRE
Sherrard, German & Kelly
FreeMarkets Center, 35th Floor
210 Sixth Avenue
Pittsburgh, Pennsylvania
 15222-2602

 Attorneys for Appellees,
Allegheny General Hospital;
Western Pennsylvania Healthcare
System, Inc.

2

OPINION OF THE COURT

SCIRICA, Circuit Judge.

In this bankruptcy appeal, the issue is whether plaintiffs should have obtained a stay under S 363(m) of the Bankruptcy Code before appealing an assumption and an assignment under S 365. See 11 U.S.C.S 363(m) (1994).

This appeal arises from the District Court's affirmance of the Bankruptcy Court's order approving the assumption of eight physician employment contracts by the Chapter 11 Trustee of a bankrupt health care system and their assignment to another hospital.1 Contending their employment contracts were not assignable, the physicians appealed.

I.

FACTUAL AND PROCEDURAL HISTORY

The Allegheny Health, Education and Research Foundation ("AHERF "), the parent corporation, managed a multi-entity healthcare network in Pittsbur gh and Philadelphia. After a decade of acquisitions, the health system grew to more than fifty not-for -profit corporations that operated health care, educational and r esearch institutions. The enterprises included Allegheny University Medical Practices, Allegheny University of the Health

_____

1. The Bankruptcy Court had jurisdiction under 28 U.S.C. S 157 and the District Court had subject matter jurisdiction over the appeal of the bankruptcy order under 28 U.S.C. S 158(a). We exercise jurisdiction under 28 U.S.C. S 158(d) over the district court's final judgment in bankruptcy and 28 U.S.C. S 1291 over any final decision by the district court. We review the bankruptcy court'sfindings of fact under a clearly erroneous standard, and its conclusions of law under a plenary standard. In re New Valley Corp., 181 F.3d 517, 522 (3d Cir. 1999), cert. denied, 528 U.S. 1138 (2000). Because the district court sits as an appellate court in bankruptcy cases, our review of its decision is plenary.
In re Lan Assocs. XI, L.P., 192 F .3d 109, 114 (3d Cir. 1999).

Sciences, Allegheny General Hospital, Allegheny University Hospital-East, Centennial Hospital, Allegheny Singer Research Institute, Allegheny University Medical Center, and The Medical College of Pennsylvania-Hahnemann University. Especially relevant here wer e AHERF physician practice plans located in the Pittsburgh ar ea.

Plaintiffs-appellants, Dr. John Cinicola and seven primary care physicians, operate the North Allegheny Internal Medicine medical practice in several locations around Pittsburgh.2 Between 1995 and 1997, the physicians signed contracts with Allegheny Integrated Health Group (now Allegheny University Medical Practices), and The Medical College of Pennsylvania-Hahnemann University (now Allegheny University of the Health Sciences) --both AHERF affiliates.

After AHERF incurred significant losses, many of its affiliates and hospitals in Philadelphia and Pittsburgh filed for bankruptcy on July 21, 1998.3 Some months after his confirmation, William Scharf fenberger, AHERF 's Chapter 11 trustee, together with some non-debtor AHERF affiliates, filed an emergency application with the Bankruptcy Court to approve a settlement agreement. For our purposes, the germane provisions of the settlement agr eement involved the sale of assets and the assignment of executory contracts, for over $25,000,000, to the Western Pennsylvania Healthcare Alliance. To assume control of several of AHERF 's not-for-profit institutions that did not file for bankruptcy, in particular Allegheny General Hospital, the settlement agreement substituted the Western

_____

2. The other plaintiffs are Bonnie K. Case, M.D.; Philip F. Rabinowitz, M.D.; Michael Farrell, M.D.; Michele R. Mathews-Mlakar, D.O.; Marsha Fino, M.D.; Elliot Smith, M.D.; and Hubert Shick, M.D. The defendants-appellees are AHERF 's Chapter 11 trustee and the Western Pennsylvania Healthcare Alliance along with Allegheny General Hospital.

3. The debtor affiliates consisted of Allegheny University of the Health Sciences, Allegheny University Medical Practices, Allegheny Hospitals-Centennial, and Allegheny University Hospitals-East. Nonetheless, some affiliated organizations in Pittsbur gh, such as Allegheny General Hospital, did not file for bankruptcy. These not-for-profit corporate affiliates in Pittsburgh included Allegheny General Hospital, Allegheny Singer Research Institute, and Allegheny University Medical Centers.

Pennsylvania Healthcare Alliance for AHERF as the institutions' sole voting member.4  The settlement agreement also provided for the assignment of the physicians' employment contracts from Allegheny University Medical Practices and Allegheny University of the Health Sciences to the Western Pennsylvania Healthcar e Alliance, which at the time had no affiliation with AHERF.

In response, the physicians filed omnibus objections with the Bankruptcy Court alleging the proposed assumption and assignment of their contracts to the Western Pennsylvania Healthcare Alliance––without their consent––violated their employment agreements pr ohibiting assignment to a non-affiliate of AHERF. 5 Moreover,

_____

4. The Western Pennsylvania Healthcare Alliance assumed control of certain AHERF affiliates through the substitution of the Western Pennsylvania Healthcare Alliance for AHERF as the sole member of these affiliates. In nonprofit corporations, members generally play a role similar to shareholders in for-profit corporations. See Howard L.Oleck & Martha E. Stewart, Nonprofit Corporations, Organizations & Associations S 240 (6th ed. 1994); Robin Dimieri & Stephen Weiner, The Public Interest and Governing Boar ds of Nonprofit Health Care Institutions, 34 Vand. L. Rev. 1029, 1045 (1981). For this reason, the acquisition of a nonprofit corporation's membership interest is comparable to the purchase of stock in a business. Paul R. DeMuro, Corporate Structure Company Issues in M&A T ransactions, and Special Issues for Physician Practice Management Companies , in Health Care M&A 1999: How to Structure the Transaction, at 165 (PLI Corporate Law and Practice Course Handbook Series No. B0-009J, 1999). By contrast, however, the members of a nonprofit corporation also manage and control the corporation. Id. at 164-65. In this case, AHERF was the sole member of its affiliates and the sale of its memberships interests to the Western Pennsylvania Healthcare Alliance effected a complete change of control.

5. The physicians' contracts provided:

> This agreement, and your rights and obligations hereunder, may not be assigned by you. This agreement, and MCP-HU's [(The Medical College of Pennsylvania-Hahnemann University)] rights and obligations hereunder, may be assigned and delegated, from time to time, by MCP-HU to AHERF, or to any other subsidiary of AHERF . . . .

For the doctors working for Allegheny University of the Health Sciences [(AUHS)], AUHS is substituted for MCP-HU in their contracts.

5

contesting Western Pennsylvania Healthcare Alliance's financial viability, the physicians asserted adequate assurance of Western Pennsylvania Healthcare Alliance's future performance of their contracts had not been provided as required by S 365(f)(2) of the Bankruptcy Code. See 11 U.S.C. S 365(f)(2)(B) (trustee may assign executory contracts only if "adequate assurance of futur e performance by the assignee of such contract or lease is pr ovided, whether or not there has been default in such contract or lease"). After holding a non-evidentiary hearing on July 22, 1999, the Bankruptcy Court issued an order the following day, July 23, approving the settlement agr eement ("the First Order"), but deferred deciding the assumption and assignment of the physicians' contracts in or der to address their objections.

At a non-evidentiary hearing on July 29, 1999 to consider the physicians' objections, the Bankruptcy Court allowed the trustee to orally amend the settlement agreement to permit the physicians' contracts to be assigned to Allegheny General Hospital, at the time an AHERF affiliate.6 This substitution was critical because the contracts explicitly prohibited assignment to an entity, like the Western Pennsylvania Healthcar e Alliance, not affiliated with AHERF. After the hearing, the Bankruptcy Court authorized the assumption of the physicians' contracts and their assignment to Allegheny General Hospital ("the Second Order"). Later that same day, the trustee assigned

_____

Dr. Cinicola's contract differed slightly and provided:

> No assignment of this Agreement or the rights and obligations
> hereunder shall be valid without the specific written consent of
both
> parties hereto, except that this Agreement may be assigned by MCP-
> HU or AIHG [(Allegheny Integrated Health Gr oup)] to any parent,
> subsidiary or affiliated corporation without prior approval of
[the]
> Physician . . . .

6. The Bankruptcy Court did not issue an or der approving this amendment to the settlement agreement. Despite the Bankruptcy Court's earlier approval of the settlement agr eement, Allegheny General Hospital remained an AHERF affiliate because the Western Pennsylvania Healthcare Alliance had not yet closed on the agreement.

the contracts to Allegheny General Hospital. The W estern Pennsylvania Healthcare Alliance then closed on the settlement agreement on August 3, 1999, substituting the Western Pennsylvania Healthcare Alliance for AHERF as the sole and controlling member of Allegheny General Hospital.

Without seeking a stay, the physicians appealed the Bankruptcy Court's Second Order to the District Court on August 5, 1999. As noted, the trustee and the W estern Pennsylvania Healthcare Alliance closed on the settlement agreement two days earlier. Befor e the District Court ruled on their appeal, however, the physicians ter minated their employment with Allegheny General Hospital ef fective October 28, 1999. On February 29, 2000, the District Court affirmed the Bankruptcy Court's Second Or der which assigned the employment agreements to Allegheny General Hospital. The physicians then appealed the assumption and assignment to this Court.

Because the sale cannot be reversed, the physicians seek vacation of the Bankruptcy Court's order appr oving the assumption and assignment of their employment contracts. Appellees contend the physicians' claims are constitutionally moot because the sale has been consummated and statutorily moot under S 363(m) because the physicians failed to obtain a stay pending appeal.

As noted, the physicians unilaterally terminated their contracts with Allegheny General Hospital, now a W estern Pennsylvania Healthcare Alliance affiliate. It became clear at oral argument that the physicians seek to invalidate the assignment of their employment contracts to avoid the noncompetition clauses in their contracts that Allegheny General Hospital would now assert.[7] The noncompetition clauses prohibit the physicians from working anywhere "within a five (5) mile radius of any medical practice location at which . . . [they] provided primary care services"

_____

7. Allegheny General Hospital's general counsel r epresented to one of the plaintiffs' attorneys that the hospital would enforce the noncompete clauses in the physicians' contracts. See Letter from Jerry J. Fedele, Senior Vice President and General Counsel, Allegheny General Hospital, to Edwin Klett, attorney for several plaintif fs, Klett, Leiber, Rooney & Schorling 1 (March 17, 2000) (Reply Br. of appellants at Ex. A).

for AHERF or its affiliates. The covenants ar guably bar the physicians from joining Allegheny General Hospital's main competitor in Pittsburgh and terminate on October 28, 2001, "two (2) years after the last date" of their employment. Id. When the noncompetition clauses expire, the physicians concede their appeal becomes constitutionally moot.

II.

CONSTITUTIONAL MOOTNESS

Because the physicians unilaterally terminated their employment, the Western Pennsylvania Healthcare Alliance and the trustee contend the physicians' appeal is constitutionally moot. In the absence of curr ent employment contracts, appellees assert there r emains neither a claim to adjudicate nor relief to grant.

Under Article III of the United States Constitution, the exercise of judicial power depends upon the existence of a case or controversy. DeFunis v. Odegaar d, 416 U.S. 312, 316 (1974); Abdul-Akbar v. Watson, 4 F.3d 195, 206 (3d Cir. 1993). Mootness derives from Article III's prohibition against federal courts issuing advisory opinions. North Carolina v. Rice, 404 U.S. 244, 246 (1971); Presbytery of N.J. of the Orthodox Presbyterian Chur ch v. Florio, 40 F.3d 1454, 1463 (3d Cir. 1994). While the Supr eme Court has spoken of the "flexible character of the Article III mootness doctrine," United States Parole Comm. v. Geraghty, 445 U.S. 388, 400 (1980), it applies where interim events remove the effects of the violation that prevent the appellate court from granting any relief. In re Cantwell , 639 F.2d 1050, 1053 (3d Cir. 1981).

To avoid mootness, a claim must (1) pr esent a real legal controversy, (2) genuinely affect an individual, and (3) have sufficiently adverse parties. Nat'l Iranian Oil Co. v. Mapco Int'l, Inc., 983 F.2d 485, 489 (3d Cir . 1992); Int'l Bhd. of Boilermakers v. Kelly, 815 F.2d 912, 915 (3d Cir. 1987). If the parties have an interest in the outcome of the litigation, regardless of size, we have found a live case or controversy exists. Ellis v. Bhd. of Ry., Airline and S.S. Clerks, 466 U.S.

8

435, 442 (1984); Mapco, 983 F.2d at 489. Thus, the case will be moot only if it is "impossible for the court to grant any effectual relief." Chur ch of Scientology of Cal. v. United States, 506 U.S. 9, 12 (1992) (citation and internal quotes omitted); In re PWS Holding Corp., 228 F.3d 224, 235 (3d Cir. 2000).

For constitutional mootness to apply, the physicians must have raised no claim on which relief could be granted. We believe relief may be available her e. If assignment of their contracts is vacated, the physicians may have a claim for rejection damages.8 Furthermore, the covenants not to compete in the physicians' contracts may survive their resignations. See In re Klein, 218 B.R. 787 (Bankr. W.D. Pa. 1998) (holding covenant not to compete in rejected franchise agreement remained effective insofar as it was enforceable under applicable law); In r e Steaks To Go, Inc., 226 B.R. 35 (Bankr. E.D. Mo. 1998) (holding covenants not to compete in rejected franchise agreements remained enforceable). Moreover, Allegheny General Hospital belies its own mootness argument by unequivocally stating its intention to enforce the noncompetition clauses. See supra note 7. Because potential contractual obligations and damages claims remain, we hold the physicians' claims are not constitutionally moot.

III.

STATUTORY BACKGROUND

As noted, the trustee assumed the physician contracts and then assigned them to Allegheny General Hospital. The physicians appeal the assignment. Before addr essing the

_____

8. See Br. of appellees (The Western Pennsylvania Healthcare Alliance and Allegheny General Hospital) at 21 ("[T]he only alternative to assumption was rejection. Rejection would have given rise to significant damages claims in accordance with S 365(g)."). Under S 365(g), rejection of an executory contract constitutes a breach immediately before the date of filing for bankruptcy and creates a pre-petition claim for breach of contract. Nevertheless, rejection does not affect the parties' substantive rights under the contract. 3 Collier on Bankruptcy PP 365.09, 365.09[1] (Lawrence P. King ed., 15th ed. 1999).

legal issues raised by the assignment, we briefly review the relevant sections of the Bankruptcy Code.

A.

11 U.S.C. S 365

Section 365 of the Bankruptcy Code authorizes the trustee to assume or reject executory contracts, enabling "the trustee to maximize the value of the debtor's estate by assuming executory contracts . . . that benefit the estate and rejecting those that do not." L.R.S.C. Co. v. Rickel Home Centers (In re Rickel Home Centers, Inc.), 209 F.3d 291, 298 (3d Cir. 2000); see also 11 U.S.C.S 365(a) ("[T]he trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."). It also permits the trustee to cure certain defaults before assumption and to provide adequate assurance of future performance of contracts in default. 11 U.S.C. SS 365(b)(1)(A), (B). If the trustee meets the assumption requirements under S 365, it must assume the executory contract entirely.9 NLRB v. Bildisco & Bildisco, 465 U.S. 513, 531 (1984); Rickel, 209 F.3d at 298.

Once the trustee assumes an executory contract,S 365 also authorizes assignment. Generally, the Bankruptcy Code supports this right and allows a trustee to assume and assign executory contracts regardless of applicable laws or contractual provisions restricting assignment. Rickel, 209 F.3d at 298-99; In r e Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) ("Section 365(f)(1) was designed to prevent anti-alienation or other clauses . . . from defeating . . . [the trustee's] ability to realize the full value of the debtor's assets."); see also 11 U.S.C. S 365(f)(1) ("[N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or

_____

9. Dr. Cinicola alleges AHERF did not entirely assume and assign his contractual obligations. In view of our treatment of statutory mootness, we do not reach this claim.

10

lease."). Before an executory contract may be assigned, the trustee first must assume the contract and "adequate assurance of future performance" of the contract must be provided. 11 U.S.C. SS 365(f)(2)(A), (B). This requirement provides needed protection to the non-debtor party because the assignment relieves the trustee and the bankruptcy estate from liability for breaches arising after the assignment.10 See 11 U.S.C. S 365(k); Rickel, 209 F.3d at 299.

_____

10. The term "adequate assurance of future performance" is not defined in the Bankruptcy Code but is included in S 365(b)(1)(C) and S 365(f)(2)(B). Section 365(b) requir es adequate assurance of future performance of an executory contract when a debtor seeks to assume an executory contract on which it has defaulted. This protection is also required when a debtor seeks to assign an executory contract under S 365(f). Under either section, the definition of the term "should be generally the same." Don Fogel, Executory Contracts and Unexpired Leases in the Bankruptcy Code, Minn. L. Rev. 341, 362 (1980).

The Court of Appeals for the Fifth Circuit hasfleshed out the definition of "adequate assurance" and concluded:

    [A]dequate assurance of future performance" are not words of art; the legislative history of the [Bankruptcy] Code shows that they were
    intended to be given a practical, pragmatic construction.

    The phrase first appears in the legislation pr oposed by the Commission on Bankruptcy Laws . . . .

    The Commission Report explains the language "adequate assurance of future performance" as follows:

    The language `is adopted from Unifor m Commercial Code S 2-609(1).' What constitutes . . . `adequate assurance of future performance' must be determined by consideration of the facts of the proposed assumption. Cf. Official Comment 4 to Uniform Commercial Code S 2-609 (1972 Edition). It is not intended, however, that any non-debtor party should acquire greater rights in a case under the act than he has outside the act." Report of the Commission on Bankruptcy Laws of the United States, H.R. Doc. No. 93-137, 93d Cong., 1st Sess. Pt. II 156-57 (1973).

    Section 2-609 of the Uniform Commercial Code, from which the bankruptcy statute borrows its critical language, provides that "when reasonable grounds for insecurity arise with respect to the performance of either party, the other may in writing demand adequate assurance of future perfor mance . . . ." The Commentaries to the Code note that " `adequate' assurance is to be `defined by

There are other protections as well. Section 365(c) places constraints on the assignment rights created under S 365(f) and prohibits the assumption or assignment of an executory contract if applicable nonbankruptcy law would excuse the other party "from accepting per formance from or rendering performance to" someone other than the debtor.11

_____

commercial rather than legal standards.' " Official Comment 3 to Uniform Commercial Code S 2-609 (1972 Ed.). What constitutes "adequate assurance" is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary and capricious.

Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309-10 (5th Cir. 1985) (quoting In re Sapolin Paints, Inc., 5 B.R. 412, 420-21 (Bankr. E.D.N.Y. 1980)); see also In re Carlisle Homes, Inc., 103 B.R. 524, 538 (Bankr. D.N.J. 1988) ("The phrase`adequate assurance of future performance,' adopted fr om section 2-609(1) of the Uniform Commercial Code, is to be given a practical, pragmatic construction based upon the facts and circumstances of each case. Although no single solution will satisfy every case, the r equired assurance will fall considerably short of an absolute guarantee of per formance.") (citations omitted).

11. The Court of Appeals for the Ninth Cir cuit has characterized the interaction between these two sections as, "WhatS 365(f)(1) appears to give, S 365(c)(1)(A) seems to take away." In re Claremont Acquisition Corp.,
Inc., 113 F.3d 1029, 1032 (9th Cir. 1997). While S 365(f) creates a broad right of assignment, S 365(c) reins it in. Section 365(f)(1) provides:

Except as provided in subsection (c) of this section, notwithstanding
a provision in an executory contract or unexpir ed lease of the debtor, or in applicable law, that pr ohibits, restricts, or conditions
the assignment of such contract or lease, the trustee may assign such contract or lease . . . .

And, the relevant exception to this authority in S 365(c) provides:

The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease
prohibits or restricts assignment of rights or delegation of duties, if
--

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting per formance from or

rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties.

12

11 U.S.C. S 365(c)(1)(A). In other wor ds, if a contract could not be assigned under applicable law, it may not be assumed or assigned by the trustee. 3 Collier on Bankruptcy P 365.06[1]. But if the other party consents--in this case, the physicians--the trustee may assume and assign the contract. 11 U.S.C. S 365(c)(1)(B). 12

B.

11 U.S.C. S 363

For sales in bankruptcy, S 363 authorizes the trustee to use, sell, or lease property of the estate outside the ordinary course of business after providing notice and hearing. 11 U.S.C. S 363(b)(1). The Bankruptcy Code broadly defines the property of the bankruptcy estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. S 541(a)(1). Executory contracts and leases also fall under this definition. Rickel, 209 F.3d at 303; Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 498 (3d Cir. 1998).

To promote certainty and finality in bankruptcy sales, S 363(m) prohibits the reversal of a sale to a good faith purchaser of bankruptcy estate property if a party failed to obtain a stay of the sale.13 The statute provides:
_____

12. 11 U.S.C. S 365(c) provides in r elevant part:

    The trustee may not assume or assign any executory contract or
    unexpired lease of the debtor, whether or not such contract or lease
    prohibits or restricts assignment of rights or delegation of duties, if
    --

    * * *

    (1)(B) such party does not consent to such assumption or
    assignment.

13. We have recognized that "section 363(m) fosters the `policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.' " Pittsburgh Food & Beverage, Inc. v. Ranallo, 112 F.3d 645, 647-48 (3d Cir. 1997) (quoting In r e Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 (3d Cir. 1986)).

> The reversal or modification on appeal of an authorization . . . of a sale or lease of pr operty does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. S 363(m).

The provision's blunt finality is harsh but its certainty attracts investors and helps effectuate debtor rehabilitation. See 3 Collier on Bankruptcy P 363.11. Nevertheless, we have rejected a per se rule "mooting appeals absent a stay of the sale . . . at issue." Krebs, 141 F .3d at 498 (holding failure to obtain stay of order approving sale of executory contracts by debtor rendered appeal moot because any remedy would affect sale). Instead, we require the satisfaction of two conditions before an appeal becomes moot underS 363(m): "(1) the underlying sale or lease must not have been stayed pending appeal, and (2) reversing or modifying the authorization to sell would affect the validity of the sale or lease." Rickel, 209 F.3d at 298 (holding failure to obtain stay order approving sale of leases by debtor rendered appeal moot); cf. Pittsburgh Food & Beverage, 112 F.3d at 649 (holding appeal of bankruptcy sale moot because court could not grant effective relief).

IV.

STATUTORY MOOTNESS

The trustee and the Western Pennsylvania Healthcare Alliance contend the physicians' appeal is statutorily moot because the assignment of the physicians' contracts triggered the protection of S 363(m). In support, appellees rely on our recent decisions in In r e Rickel Home Centers, Inc., 209 F.3d 291 (3d Cir. 2000), and Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490 (3d Cir. 1998), which, they argue, require pr ocuring a stay pending appeal to avoid mootness when an assignment and sale are authorized under SS 363 and 365.

14

First we must examine whether S 363(m) applies to the assignment of the physician contracts to Allegheny General Hospital and the Western Pennsylvania Healthcare Alliance's subsequent substitution as the sole member of Allegheny General Hospital. Rickel, 209 F .3d at 300; In re Joshua Slocum Ltd., 922 F.2d 1081, 1084–85 (3d Cir. 1990). In other words, we must decide whether AHERF 's assumption and assignment of these executory contracts to Allegheny General Hospital, which was later sold to the Western Pennsylvania Healthcare Alliance, remain exclusively under the scope of S 365 or trigger the protection of S 363(m) as well.

A.

To recapitulate, although the Bankruptcy Court authorized the assignment of the physicians' contracts to Allegheny General Hospital under the Second Or der (issued July 29, 1999), the Western Pennsylvania Healthcare Alliance gained control of several AHERF affiliates, including Allegheny General Hospital, under the authority of the First Order (issued July 23, 1999). Entered under S 363 and S 365, the First Order authorized the substitution of the Western Pennsylvania Healthcar e Alliance for AHERF as the controlling member of Allegheny General Hospital. See Order Approving Settlement Agr eement on July 23, 1999. As noted, AHERF initially intended to assign the contracts directly to the Wester n Pennsylvania Healthcare Alliance. When the physicians objected, the Bankruptcy Court permitted the trustee to orally amend the settlement agreement to assign the physicians' contracts to Allegheny General Hospital. This amendment enabled the trustee and the Western Pennsylvania Healthcar e Alliance to achieve through a change of control what they could not accomplish through direct assignment. The physicians contend the amendment was improper. But we need not decide whether this maneuver invalidated the assignment. Assuming the assignment was invalid, the physicians may have failed to perfect their right to appeal.

The Bankruptcy Code provides debtors with br oad authority to assume and assign executory contracts, which we have defined as "a contract under which the obligation

15

of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." In re Columbia Gas Sys. Inc., 50 F.3d 233, 238 (3d Cir. 1995) (quoting Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989)).14 Neither party disputes the executory nature of the physicians' employment contracts. Moreover , S 365 permits the debtor to assume and assign executory contracts the trustee deems advantageous. 11 U.S.C. S 365(f)(1); 2 Norton Bankruptcy Law and Practice S 39:1 (W illiam L. Norton Jr. ed., 2d ed. 1997). Although assignment requir es the satisfaction of certain conditions, the Bankruptcy Code "favors free assignability." Rickel , 209 F.3d at 299.

In addition, S 363 enables the debtor to sell property of the bankruptcy estate. 11 U.S.C. S 363; 2 Norton Bankruptcy Law and Practice S 37:1. The br oad definition of property of the bankruptcy estate encompasses"all legal or equitable interests of the debtor," and includes executory contracts. 11 U.S.C. S 541(a)(1); see also Rickel, 209 F.3d at 303; Krebs, 141 F.3d at 498; 2 Norton Bankruptcy Law and Practice S 37:16. Once the debtor sells its property, S 363(m) prohibits reversing a sale when a party fails to obtain a stay pending appeal, unless vacating or modifying the sale would not affect its validity. 11 U.S.C. S 363(m); Krebs, 141 F.3d at 499.

We first explored the relationship between S 363 and S 365 in Krebs Chrysler–Plymouth v. Valley Motors, Inc., 141 F.3d 490 (3d Cir. 1998). In Kr ebs, we found an assumption of executory contracts implicated the mootness pr otection of a sale under S 363(m) when a bankrupt automobile dealer sought authorization to assume and sell certain franchise agreements. After winning an auction to purchase the assumed franchise agreements from the debtor, Krebs,

_____

14. See, e.g., Lubrizol Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1045 (4th Cir. 1985) (adopting executory contracts definition propounded by Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973)), cert. denied, 475 U.S. 1057 (1986); see also Bildisco, 465 U.S. at 522 n.6 (1984) (characterizing executory contracts as contracts on which per formance is due on both sides based on legislative history).

another automobile dealer, refused to pay the bankruptcy estate. The bankruptcy court then order ed him to close on the sale, and, in an effort to avoid this obligation, Krebs appealed the debtor's initial assumption of the agr eements under S 365 as improper. After the district court affirmed the bankruptcy court's order, we held Kr ebs's appeal moot under S 363(m). Finding the executory contracts constituted property of the estate under S 541 of the Bankruptcy Code and Pennsylvania law, we also concluded that " assignments of franchises under section 365 are also sales of estate property subject to section 363(m) . . . . Therefore, section 363(m) governs the sale of the franchises her e, notwithstanding that section 365 applies to the particular mechanics of conveyance." Krebs, 141 F.3d at 497–98 (emphasis added). To state it another way, the sale of an executory contract triggers the protections af forded sales of bankruptcy estate property but also requir es satisfaction of the requirements for assuming and/or assigning the same executory contract. Rickel, 209 F.3d at 302 n.11. In a subsequent case regarding the assignment and sale of leases by a debtor in bankruptcy, we reaffir med the rationale in Krebs. Id. at 300.

There is a nexus between S 363 and S 365. One court explained their correspondence:

> Even though assignments of executory contracts ar e governed by S 365 and not by the mor e general S 363 sales provision, assignments are in fact just a type of sale. Instead of purchasing or leasing pr operty, transactions governed by S 363, an assignee purchases a lease. A good faith assignee, therefor e stands in the same shoes as a good faith purchaser and as an innocent third party depends on the finality of bankruptcy orders to the same extent as good faith purchasers.15

_____

15. As Judge Sloviter has pointed out, "[T]he same policy concerns are equally applicable to lease assignments and to sales or leases or property. Assignment of a lease is, after all, simply the purchase of a right to lease property." Slocum, 922 F.2d at 1096 (Sloviter, J., dissenting).

17

Comco Assocs., SPA 77k L.P. v. Faraldi Food Indus. Ltd.,
170 B.R. 765, 769 n.9 (E.D.N.Y. 1994).

Under Krebs, 141 F.3d at 498-99 (executory contracts), and
Rickel, 209 F.3d at 301-02 (lease contracts), a party need
only obtain a stay pending appeal when the debtor r eceives
authorization to assign and sell executory contracts or
leases under both S 363 and S 365. If there is no sale of the
assigned property, S 363 will not apply. See Slocum, 922
F.2d at 1085 (refusing to requir e parties to obtain a stay
when only S 365 implicated).

Other courts have not explicitly extended S 363(m)'s
reach to assignments under S 365, but they have embraced
our interpretation of statutory mootness and found cases
moot for similar reasons. Rickel, 209 F .3d at 304
(discussing cases). For example, in In r e Adamson Co. Inc.,
159 F.3d 896 (4th Cir. 1998), a bankrupt steel tank
manufacturer sought to sell its assets and assign the lease
on its manufacturing plant to a shareholder . The landlord
objected, but failed to seek a stay of the bankruptcy court's
order authorizing the assignment. The Court of Appeals for
the Fourth Circuit held the case moot because the
leasehold was personal property that trigger ed the

_____

The synonymous definitions of assignment and sale add further weight
for considering the terms together. An assignment is by definition:

> [The] act of transferring to another all or part of one's property
> interest, or rights. A transfer or making over to another of the
whole
> of any property, real or persona, in possession or in action, or of
any
> estate or right therein. It includes transfers of all kinds of
property,
> including negotiable instruments. The transfer by a party of all of
its
> rights to some kind of property, usually intangible property such
as
> rights in a lease, mortgage, agreement of sale or a partnership.
> Tangible property is more often transferred by possession and by
> instruments conveying title such as a deed or a bill of sale.

Black's Law Dictionary 119 (6th ed. 1990) (citation omitted).

A sale by definition is a "revenue transaction where goods or services
are delivered to a customer in retur n for cash or a contractual
obligation
to pay. Term comprehends transfer of property from one party to another
for valuable recompense." Id. at 1337.

protection of S 363(m).16 Id. at 898. Also, in Comco Assocs., SPA 77k L.P. v. Faraldi Food Indus. Ltd., 170 B.R. 765 (E.D.N.Y. 1994), where a bankrupt meat market assigned its property leases, the district court dismissed the lessor's appeal because "any appeal of a consummated assignment pursuant to S 365 must be dismissed as moot."17 170 B.R. at 770. The Court of Appeals for the First Cir cuit extended S 363(m)'s mootness protection to assignments fundamentally intertwined with a S 363 sale in In re Stadium Mgmt. Corp., 895 F.2d 845 (1st Cir. 1990). Holding the assignment of a professional football team's stadium sublease together with the purchase of r elated assets was protected by S 363(m), the court concluded S 363(m) would apply to transactions in which the "assignment of the [executory contract] was integral to the sale and removing it from the sale would . . . adversely af fect[ ] the terms of the sale." Id. at 849.

The trustee contends that "the transaction consummated pursuant to the Global Settlement Agreement, including the assumption and assignment of the Contracts by the trustee to AGH [(Allegheny General Hospital)]" involves both SS 365 and 363 because of the settlement agreement's "hybrid nature." Br. of appellee (Trustee) at 13. Invoking S 363 and S 365 in its First Order, the Bankruptcy Court authorized the transactions contemplated by the settlement agr eement. See Bankruptcy Order of July 23, 1999. As noted, the Bankruptcy Court's First Order authorizing the

_____

16. The Court of Appeals for the Ninth Cir cuit found the protection of S 363(m) applied to a bankruptcy court or der "permitting the assumption and assignment of leases . . . [that also] pr ovided authorization for the trustee's sale [of the leases]," overtur ning the decision of the Bankruptcy
Appellate Panel to void the assignment, because the assigned leases were sold and no stay pending appeal was obtained. In re Exennium, Inc., 715 F.2d 1401, 1404-05 (9th Cir. 1983).

17. The district court based its decision on the reasoning presented by the dissent in Slocum which stated, "[W]ell-established rules of justiciability found in the cases of this court and others, along with the particular need of finality in bankruptcy, r equire that we find the appeal
of a completed lease assignment to a non-party moot unless the appellant has sought a stay pending appeal." 922 F.2d at 1093 (Sloviter, J., dissenting).

19

implementation of the settlement agreement deferred action on the physicians' contracts,18 and the Second Order addressed only the assumption and assignment of the physicians' contracts under S 365. (See Bankruptcy Order of July 29, 1999). Nonetheless, it is clear the Bankruptcy Court intended its Second Order to operate in conjunction with its First Order. See T ranscript of Bankruptcy Hearing, United States Bankruptcy Court for the Wester n District of Pennsylvania, July 29, 1999, at 17. Although the physicians argue the Second Order r epresented an independent act, authorized solely under S 365, we are convinced the assumption and assignment of the physician contracts were inextricably intertwined with AHERF 's sale of assets to the Western Pennsylvania Healthcare Alliance. Because the assignment here involved a sale under S 363 and the First Order was authorized under S 363 and S 365, the mootness provision of S 363(m) applies to the assignment of the physicians' contracts.19

_____

18. The Bankruptcy Order of July 23, 1999 pr ovides:

> Notwithstanding anything in this Settlement Or der, the Global Settlement Agreement or any exhibits or schedules thereto, nothing in this Settlement Order or any exhibit her eto shall be deemed to
>
> (a)
>
> in any way affect, including without limitation, authorizing the assumption, assumption and assignment or rejection of any agreement, including without limitation any executory contract or expired lease between any of AUH-East, AHC, or the Debtors on the one hand, and . . . any of the objecting doctor gr oup represented
>
> by
>
> Kabal & Geeseman on the other hand . . . . The disposition of any such agreement, including without limitation any executory contracts . . . between any of AUH-East, or the Debtors, on the one hand and any of . . . the objecting doctor gr oup represented by Kabal & Geeseman on the other hand . . . shall be determined by separate order(s) of this Court.

Bankruptcy Order of July 23, 1999 at P 27.

19. The physicians' characterization of the Bankruptcy Court's orders as effecting a double assignment of their contracts forms the basis of their claim that only S 365 should govern our analysis. By approving the assignment of their contracts, they argue, the Bankruptcy Court failed to enforce the protections required by S 365. In other words, the physicians contend their assignment and transfer from AHERF employers to Allegheny General Hospital followed by the substitution of the Western

20

B.

As noted, we have rejected a per se rule which would
moot every appeal not accompanied by a stay under S 363,

(Text continued on page 23)

_____

Pennsylvania Healthcare Alliance for AHERF r epresented a two-part
assignment that is invalid under In re W est Elecs. Inc., 852 F.2d 79 (3d
Cir. 1988).

In West, we held S 365(c)(1) created a "hypothetical test" whereby an
assignment of an executory contract was invalid if precluded by
applicable law. 852 F.2d at 83. West Electronics had contracted with the
United States government to produce missile launcher supply units.
After the company filed for bankruptcy, it sought to assume its contract
with the government. Relying on a federal statute that prohibited
assignment of government contracts without its consent, the government
sought to terminate the contract. See 41 U.S.C. S 15 ("No [government]
contract . . . or any interest therein, shall be transferred by the part
to
whom such contract . . . is given to any other party, any such transfer
shall cause the annulment of the contract . . . transferred, so far as the
United States are concerned.") The West court agreed with the
government and interpreted S 365(c)(1) in this way:

> [I]f non-bankruptcy law provides that the government would have to
> consent to an assignment of the West Contract to a third party,
i.e.,
> to someone `other than the debtor or the debtor in possession,'
then
> West, as the debtor in possession, cannot assume that contract.
> This provision limiting assumption of contracts is applicable to
any
> contract subject to a legal prohibition against assignment.

852 F.2d at 83.

That is, the "hypothetical test" requir es courts to decide whether, under
applicable law, assignment to a third party would be forbidden. See In re
Catapult Entm't, Inc., 165 F.3d 747, 749-50 (9th Cir.) (adopting
"hypothetical test"), cert. dismissed, 528 U.S. 924 (1999); In re Catron,
158 B.R. 629, 638 (E.D. Va. 1993) (same), aff 'd without opinion, 25 F.3d
1038 (4th Cir. 1994); but see Institut Pasteur v. Cambridge Biotech Corp.,
104 F.3d 489, 493-94 (1st Cir.), cert. denied, 521 U.S. 1120 (1997); In re
Cajun Elec. Power Coop., Inc., 230 B.R. 693, 705 (Bankr. M.D. La. 1999)
(rejecting "hypothetical test"); In r e Lil' Things, Inc., 220 B.R. 583,
587
(Bankr. N.D. Texas 1998) (same); Inre GP Express Airlines, Inc., 200 B.R.
222, 232 (Bankr. D. Neb. 1996) (same); In re American Ship Bldg. Co.,
Inc., 164 B.R. 358, 363 (Bankr. M.D. Fla. 1994) (same); In re Ontario

Locomotive & Indus. Ry. Supplies (U.S.) Inc., 126 B.R. 146, 147–48
(Bankr. W.D.N.Y 1991) (same) (or der subsequently vacated on other

21

grounds); see generally Daniel J. Bussel & Edward A. Friedler, The Limits on Assuming and Assigning Executory Contracts, 74 Am. Bankr. L.J. 321 (Summer 2000) (critiquing "hypothetical test"). Citing Pennsylvania law, the physicians note that personal service contracts are assignable only if the employee "either expressly or implicitly by his conduct consented to the assignment." All-Pak, Inc. v. Johnston , 694 A.2d 347, 351 (Pa. Super. Ct. 1997). Because the choice of law clause in each of their contracts specified Pennsylvania law, the physicians claim the protections in S 365(c) apply.

Notwithstanding the common law assignment rule in Pennsylvania, the physicians' contracts permitted AHERF to assign their contracts to any AHERF subsidiary without their consent. The physicians' employment agreements generally provided that "[t]his Agreement . . . may be assigned and delegated . . . to AHERF, or to any other subsidiary of AHERF, provided that AUHS [Allegheny University of the Health Sciences] shall remain liable for its obligations under this Agreement in the event of such assignment." (other contracts contained the same language except "MCP-HU" (Medical College of Pennsylvania-Hahnemann University) is substituted for "AUHS"). As noted, the original settlement agreement initially proposed assigning the physicians' contracts directly to the Western Pennsylvania Healthcar e Alliance, the Allegheny Medical Practice Network or the Allegheny Specialty Practice Network. But this would have violated the assignment provisions in the physicians' contracts, because none of these organizations was affiliated with AHERF. As noted, the Bankruptcy Court authorized the trustee to orally amend the Settlement Agreement and assign the contracts to Allegheny General Hospital, an AHERF subsidiary, befor e the Western Pennsylvania Healthcare Alliance assumed AHERF 's controlling position as Allegheny General Hospital's sole member. For this reason, the physicians argue the assignment by AHERF of their contracts to Allegheny General Hospital, which the Wester n Pennsylvania Healthcare Alliance subsequently acquired, repr esents a disingenuous, two-step assignment intended to indirectly accomplish what the Bankruptcy Code and their employment contracts prohibited. Relying on the "hypothetical test" established in West, the physicians contend this circuitous "assignment" to Alliance is invalid. Because Pennsylvania law permits assignment of personal service contracts only with employee consent—which AHERF allegedly did not obtain—the physicians contend the assignment should be vacated.

Although the settlement agreement was amended to avoid violating AHERF 's contractual duties to the physicians, the Western Pennsylvania Healthcare Alliance maintains the trustee lawfully assigned the

22

and formulated a two-prong test for mootness: (1) whether
the underlying sale was stayed pending appeal, and (2)

_____

physicians' contracts to Allegheny General Hospital. The Western
Pennsylvania Healthcare Alliance points out that the physicians
contractually consented to assignment of their contracts to any AHERF
affiliate. The Western Pennsylvania Healthcare Alliance also maintains it
obtained the physicians' contracts when it lawfully acquired control over
Allegheny General Hospital. Hence there was no second assignment. In
support, the Western Pennsylvania Healthcare Alliance cites Institut
Pasteur v. Cambridge Biotech Corp., 104 F.3d 489 (1st Cir.), cert. denied,
521 U.S. 1120 (1997), and abrogated on other grounds, Hardemon v. City
of Boston, No. 97-2010, 1998 WL 148382, at *1 (1st Cir. April 6, 1998).

In Institut Pasteur, the debtor sought assumption of a patent license
agreement and confirmation of a plan to transfer the debtor's stock to an
entity that directly competed with the patent's licensor. The licensor
argued the stock transfer represented a de facto assignment in violation
of S 365(c)'s applicable law exception toS 365(f), because patents are
presumed unassignable under federal common law. See Institut Pasteur,
104 F.3d at 490-91. In rejecting the licensor's claim and permitting the
transfer, the Court of Appeals for the First Circuit rejected the
"hypothetical test" for assignments followed by some circuits, including
our own. Id. at 493. The court found that the debtor corporation
represented the same entity with which the licensor had originally
contracted and, therefore, the debtor could not be prohibited from
assuming the patent under federal law. Id. at 493-94. Because the
license agreement did not contain a "change in control" provision in the
license agreement between Institut Pasteur and Cambridge Biotech
Corporation, the court found the transfer could not be prevented. Id. at
494.

The court adopted an "actual perfor mance test" necessitating a "case-
by-case inquiry into whether the nondebtor . . . was being forced to
accept performance under its executory contract from someone other
than the debtor party with whom it originally contracted." Id. at 493
(internal quotations omitted). The Western Pennsylvania Healthcare
Alliance argues its control of Allegheny General Hospital did not alter
the
physicians original contractual obligations, because their employment
contracts provided for their assignment to Allegheny General Hospital.
Moreover, it contends its purchase of AHERF 's assets, which included
the physicians' contracts, is analogous to the stock transfer in Institut
Pasteur. Yet the Western Pennsylvania Healthcare Alliance's analysis
would seem to rest on the application of an"actual performance test"
which would be at odds with the "hypothetical test" adopted by our
circuit.

23

whether a reversal or modification of the authorization to
sell would affect the validity of the sale. Krebs, 141 F.3d at
499.20 The only matter at issue then is whether any relief
can be fashioned for the physicians that would not affect
the validity of the sale. In Krebs, we recognized that
allowing a debtor to reject an executory contract after it had
been assumed and sold "would have an impact on the
validity of the . . . sale . . . because [it] . . . would

_____

Whichever interpretation best serves S 365(c), we must first answer the
question of statutory mootness before pr oceeding to the merits of the
physicians' challenge to the assumption and assignment of their
contracts. Because we find the mootness issue r equires further
development in the District Court, this case does not require us to
revisit
our exegesis of S 365(c).

20. The Krebs court developed this test from an earlier application of
mootness protection under S 364(e) for obtaining credit or incurring debt
under S 364. In re Swedeland Dev. Group, Inc., 16 F.3d 552, 559-63 (3d
Cir. 1994) (en banc). In Swedeland, the debtor was a developer who
obtained post-petition loans for a construction pr oject under S
364(d)(1).
A pre-petition creditor sought to for eclose on the developer's assets and
opposed the authorization of further credit for the debtor. When the
creditor appealed the loan authorizations without obtaining a stay
pending appeal, we held, "[I]t is impossible to conclude that section
364(e) in itself requires that an appeal be dismissed if a stay is not
obtained." Id. at 559. With language that mirrors S 363(m), S 364(e)
provides:

        The reversal or modification on appeal of an authorization under
        this section to obtain credit or incur debt, or of a grant under
this
        section of a priority lien, does not affect the validity of any
debt so
        incurred, or any priority or lien so granted, to an entity that
        extended such credit in good faith, whether or not such entity knew
        of the pendency of the appeal, unless such authorization and the
        incurring of such debt, or the granting of such priority or lien,
were
        stayed pending appeal.

11 U.S.C. S 364(e).

Because S 364(e) and S 363(m) are based on similar language, the Krebs
court viewed "section S 363(m) through the prism of Swedeland's
construction of section 364(e)." Krebs , 141 F.3d at 499. This perspective
provided the basis for the promulgation of the same two-prong test for
S 363(m) by the Krebs court.

necessarily require reversing the subsequent assumption and assignment of the underlying [executory contracts]. Clearly, this remedy is not permitted by section 363(m)." Id.

In the District Court, the physicians requested reversal of the assumption and assignment of their employment contracts as well as a declaration of nonassignability. As noted, the District Court affirmed the Bankruptcy Court's order without opinion and without addressing mootness. Consequently, the District Court did not examine the effect, if any, vacating or modifying the assumption and assignment order would have on the sale between AHERF and the Western Pennsylvania Healthcar e Alliance. For this reason, we will vacate the order of the District Court and remand this matter to allow it to consider whether the requested relief would affect the validity of the transaction between AHERF and the Western Pennsylvania Healthcare Alliance. Whether our jurisprudence permits the assignment of the physicians' contracts, and, if so, whether the assignment satisfied the requirements of S 365 cannot be addressed until mootness is resolved. If the District Court finds reversing or modifying the assignment would not affect the validity of the sale, then the court must determine both issues.

V.

CONCLUSION

For the reasons stated, we will vacate the or der of the District Court and remand for proceedings consistent with this opinion.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

25