**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1430
_____

In re: ENERGY FUTURE HOLDINGS CORP,
AKA TXU Corp., AKA Texas Utilities, et al.,

Debtors

SHIRLEY FENICLE, individually and as successor-in-
interest to the Estate of
George Fenicle; DAVID WILLIAM FAHY; JOHN H.
JONES; DAVID HEINZMANN; *HAROLD BISSELL;
*KURT CARLSON; *ROBERT ALBINI, individually and as
successor-in-interest to the Estate of Gino Albini; DENIS
BERGSCHNEIDER,

Appellants
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-18-cv-00381)
District Judge:  Honorable Richard G. Andrews
_____

Argued September 18, 2019

_____

* Dismissed Pursuant to Court's Order dated 9/18/19.

Before: KRAUSE and MATEY, *Circuit Judges*, and
QUIÑONES ALEJANDRO,[†] *District Judge*

(Opinion filed: February 18, 2020)

Daniel K. Hogan
Hogan McDaniel
1311 Delaware Avenue
Suite 1
Wilmington, DE 19806

Steven Kazan
Kazan McClain Satterley & Greenwood
55 Harrison Street
Suite 400
Oakland, CA 94607

Leslie M. Kelleher [ARGUED]
Jeanna R. Koski
Caplin & Drysdale
One Thomas Circle, N.W.
Suite 1100
Washington, DC 20005
        *Counsel for Appellants*

Matthew C. Brown
Thomas E. Lauria
Joseph A. Pack
White & Case

---

[†] Honorable Nitza I. Quiñones Alejandro, District Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

200 South Biscayne Boulevard
Suite 4900
Miami, FL 33131

J. Christopher Shore [ARGUED]
White & Case
1221 Avenue of the Americas
New York, NY 10020

Jeffrey M. Schlerf
Fox Rothschild
919 North Market Street
Suite 300
Wilmington, DE 19801
    *Counsel for Appellee Reorganized EFH Debtors*

Daniel J. DeFranceschi
Jason M. Madron
Richards Layton & Finger
920 North King Street
One Rodney Square
Wilmington, DE 19801

Mark E. McKane [ARGUED]
Kirkland & Ellis
555 California Street
Suite 2700
San Francisco, CA 94104
    *Counsel for Appellee EFH Plan Administrator Board*

Jennifer Bennett
Public Justice
475 14th Street

Suite 610
Oakland, CA 94607

Michael J. Quirk
Motley Rice
40 West Evergreen Avenue
Suite 104
Philadelphia, PA 19118
    *Counsel for Amicus Curiae Public Justice*

————————————————

**OPINION OF THE COURT**
————————————————


KRAUSE, *Circuit Judge*.

We must determine whether and under what circumstances a bankruptcy debtor's Chapter 11 plan of reorganization may discharge the claims of latent asbestos claimants. The Bankruptcy Court determined that the discharge of such claims is permissible so long as the claimants receive an opportunity to reinstate their claims after the debtor's reorganization that comports with due process. We agree and therefore will affirm.

## I.  Facts

This case, while complex on its surface, is in fact quite simple when understood in historical and legal context. We thus set out that context before turning to a discussion of the underlying facts and procedural history.

## A. Asbestos Litigation in Bankruptcy

The great tragedy of this country's history of asbestos exposure and related disease is by now well documented. The asbestos crisis entails "a tale of danger known in the 1930s, exposure inflicted upon millions of Americans in the 1940s and 1950s, injuries that began to take their toll in the 1960s, and a flood of lawsuits beginning in the 1970s." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 598 (1997) (citation omitted). Those lawsuits have proved particularly difficult for our courts to manage because asbestos exposure gives rise to "a latency period that may last as long as 40 years for some asbestos related diseases." *Id.* (citation omitted). That latency period bifurcates most classes of asbestos plaintiffs between those who have already contracted asbestos-related disease ("manifested claimants") and those who have been exposed and are merely at risk ("latent claimants"), *see id.* at 610–11; many of the latter may not even realize the fact of their exposure, *id.* at 611. Such "legions so unselfconscious and amorphous" pose problems for which our civil procedure rules were not designed. *Id.* at 628.

The poor fit between our civil procedure rules and asbestos litigation has been mirrored by an equally poor fit between our bankruptcy law and asbestos litigation. The mismatch occurs because the long latency period for asbestos-related disease is incompatible with the "public policy of affording finality to bankruptcy judgments." *In re Cont'l Airlines*, 91 F.3d 553, 560 (3d Cir. 1996) (en banc). In the normal course of a bankruptcy proceeding, the court sets a deadline—known as a "bar date"—before which proofs of claim against the debtor's estate must be filed; all of these claims receive treatment under the proposed plan of reorganization and, upon confirmation of the plan, all claims

5

for which proofs of claim are not filed are discharged by the bankruptcy. But while this "procedural design works relatively well in the typical Chapter 11 corporate restructuring of the debtor's current assets and liabilities," it is poorly outfitted to "address the claims of not only current creditors but also currently unknowable future creditors" like latent asbestos claimants. S. Todd Brown, *How Long Is Forever This Time? The Broken Promise of Bankruptcy Trusts*, 61 Buff. L. Rev. 537, 541–42 (2013). That is because discharging the claims of "unknowable future creditors" implicates due process concerns: namely, that they have been deprived of their property—their claims—without notice of or a hearing regarding the discharge. *See id.*

This dilemma was first confronted in the landmark case of *In re Johns-Manville Corp.*, 68 B.R. 618 (Bankr. S.D.N.Y. 1986). There, the court announced an "innovative and unique" solution to the problem of asbestos-driven bankruptcy. *Id.* at 621. The court's innovation was to abstain from addressing all of the debtor's asbestos liability at once; instead, it provided for the creation and funding of a trust by the debtor to address individual asbestos claims against the debtor as those claims manifested. *Id.* at 621–22. To ensure that the claims were directed toward the trust, the court imposed an injunction that "effectively channel[ed] all asbestos related claims and obligations away from the reorganized entity and target[ed] [them] towards the . . . [t]rusts." *Id.* at 624. The injunction thereby ensured that latent claimants were "treated identically" to symptomatic claimants. *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 640 (2d Cir. 1988).

The *Johns-Manville* court's innovation proved so successful that Congress decided to codify it. As we later explained, "The Manville Trust was the basis for Congress'

effort to deal with the problem of asbestos claims on a national basis, which it did by enacting § 524(g) of the Bankruptcy Code." *In re Grossman's Inc.*, 607 F.3d 114, 126 (3d Cir. 2010) (en banc). That new provision, § 524(g), "took account of the due process implications of discharging future claims of individuals whose injuries were not manifest at the time of the bankruptcy petition," *id.* at 127, by requiring the court to determine that the injunction is "fair and equitable" to future claimants, 11 U.S.C. § 524(g)(4)(B)(ii), to appoint a representative of future claimants' interests, *id.* § 524(g)(4)(B)(i), and to obtain an approval vote from at least three-quarters of asbestos claimants, *id.* § 524(g)(2)(B)(ii)(IV)(bb).

But § 524(g), while expanding the toolbox for resolving asbestos liability in bankruptcy, was not a panacea. Our Court discovered as much in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004). There, we recognized that "just and efficient resolution of [asbestos] claims has often eluded our standard legal process" and, consequently, that "asbestos liabilities ha[d] pushed otherwise viable companies into bankruptcy." *Id.* at 200–01. *Combustion Engineering* was one such case: The debtor had fallen into bankruptcy because of "mounting personal injury liabilities," and it sought to resolve its debts with a Chapter 11 reorganization founded upon a § 524(g) trust and injunction. *Id.* at 201. On the facts of that case, however, we were forced to conclude that even the § 524(g) trust might have "impermissibly discriminate[d] against certain asbestos personal injury claimants," and we therefore "remand[ed] for additional fact-finding." *Id.* at 239.

Our struggle with asbestos-driven bankruptcy and due process left off—until today—with *Grossman's*. In that case, we convened en banc to consider whether a person whose

7

"underlying asbestos exposure occurred pre-petition but [whose] injury manifested itself post-petition" had a "claim" for bankruptcy purposes. 607 F.3d at 117. We held that such a person did have a claim—i.e., that bankruptcy claims accrue at the time of exposure—overruling our much-maligned rule that bankruptcy claims accrued at the time of an injury. *Id.* at 125. But as this holding dictated that asbestos claims—even those that are latent at the time of bankruptcy—are dischargeable through the bankruptcy process, we cautioned that "fundamental principles of due process" still applied. *Id.* Thus, while we echoed our earlier observation in *Combustion Engineering* that a § 524(g) trust was "specifically tailored to protect the due process rights of future claimants" and was perhaps the best vehicle for addressing these concerns, *id.* at 127 (quoting *Combustion Eng'g*, 391 F.3d at 234 n.45), we made clear that the ultimate question remained whether the discharge of latent asbestos claims "comport[ed] with due process," taking into account various factors—only one of which was "whether it was reasonable or possible for the debtor to establish a trust for future claimants as provided by § 524(g)." *Id.* at 127–28.

Against that backdrop, we turn to the facts of this case, where latent claims were discharged in bankruptcy without the creation of a § 524(g) trust, prompting us again to consider the application of due process to this challenging context.

## B. EFH's Bankruptcy

Appellee Energy Future Holdings Corporation ("EFH") was a holding company for various energy properties. Among EFH's many subsidiaries were four that we will call, collectively, the "Asbestos Debtors"—long-defunct entities only in existence because of ongoing asbestos liability. One of

8

the Asbestos Debtors, EECI, was the successor corporation of a firm involved in power-plant construction for several decades in the mid- to late twentieth century. That industry was reliant on asbestos at the time, so EECI's predecessor exposed its employees to slow-acting but life-threatening carcinogens. As a result, in the years leading up to this case, EFH was paying asbestos-related claims on behalf of the Asbestos Debtors—principally, it seems, EECI—at a rate of $1 million to $4 million per year.

Separately, EFH became debt-distressed as the price of natural gas, upon which it relied for revenue, fell due to the advent of fracking. That led EFH, along with each of its subsidiaries including the Asbestos Debtors, to file a voluntary Chapter 11 bankruptcy reorganization petition. The resulting proceedings were so consequential and complex that the diligent and experienced Bankruptcy Court judge handling them considered them "the privilege of [his] professional career." JA 1661. Over the course of those proceedings, EFH was ultimately split into two entities: One side, with which we are not concerned here, emerged from bankruptcy as a separate going concern, while the other—what remained of EFH—sought a buyer.

The crown jewel of EFH's remaining holdings was a firm called Oncor, the largest electricity transmission and distribution company in Texas. Oncor was the locus of attraction for EFH's suitors, among whom were Berkshire Hathaway and NextEra, Inc. But EFH could not sell Oncor alone without triggering massive tax liability and converting the deal into a net loss for the potential buyer. EFH and potential buyers thus agreed that, to ensure profitability, the sale of Oncor would need to be structured as a merger. And a merger meant that the buyer would need to take on not only

Oncor but also EFH's other properties, including the Asbestos Debtors.

Understandably, then, EFH's potential buyers sought to ascertain their potential asbestos liability. An expert report commissioned by EFH determined that the remaining liability was between $36 million and $54 million. With these figures in mind, EFH's first tentative buyer, NextEra, suggested creating a § 524(g) trust. But EFH's lawyers apparently believed that the process of establishing such a trust would be unwieldy, so they rebuffed the proposal. NextEra's acquisition of Oncor was soon blocked anyway by Texas regulators, prompting EFH to open negotiations with another suitor, Sempra Energy.

Sempra, unlike NextEra, did not propose creating a § 524(g) trust to manage EFH's asbestos liability. Instead, Sempra homed in on another potential funding source: intercompany loans among EFH and the Asbestos Debtors. These loans had been created years before the bankruptcy, when the Asbestos Debtors had been effectively liquidated and EFH had sold their assets and transferred the profits up to the parent level. EFH recorded these funds as intercompany loans because the money reaped in the sale of the Asbestos Debtors' assets technically belonged to the Asbestos Debtors. By the time of EFH's bankruptcy petition, EFH owed over $800 million to the four Asbestos Debtors. Sempra proposed to reinstate and fund these loans in full after the reorganization so as to pay all asbestos claims that were filed by the bar date, relegating discharged claimants to the post-confirmation process available under the bankruptcy rules—specifically Federal Rule of Bankruptcy Procedure 3003(c)(3). That rule provides that a bankruptcy court "shall fix and for cause shown may extend the time within which proofs of claim or interest

10

may be filed," Fed. R. Bankr. P. 3003(c)(3), allowing claimants to file proofs of claim after the bar date if they show "excusable neglect," *see Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd.*, 507 U.S. 380, 388–89 (citing Fed. R. Bankr. P. 9006(b)(1)). With that process built into EFH's proposed plan of reorganization, the Bankruptcy Court approved the merger conditioned upon eventual confirmation of the plan.

## C. The Asbestos Challengers

Although nearly all of EFH's creditors were satisfied by its proposed plan of reorganization, one group of creditors was not: latent asbestos claimants. The latent claimants argued that setting a bar date for latent claims and discharging any claims not filed with the court would violate their due process rights under *Grossman's*. But the Bankruptcy Court disagreed and denied their "[motion] in opposition to the imposition of a claims bar date affecting present and future asbestos personal injury claimants." JA 280 (capitalization altered). Instead, consistent with Rule 3003(c)(3) and the approach advocated by Sempra, it held that "a bar date must be established for all claims . . . even though the Court may later extend such bar date for cause shown." JA 350.

To notify potential asbestos claimants of the bar date, EFH agreed to formulate, fund, and implement a notice plan that cost over $2 million and that led nearly 10,000 latent claimants to file proofs of claim before that date.

Although they did not attempt an interlocutory appeal of the order setting the bar date, latent claimants continued to attack the bar date in the subsequent proceedings leading up to the confirmation of the plan. In rejecting each of these challenges on the merits, the Bankruptcy Court had ample

11

occasion to elucidate its understanding of the due process issues. Specifically, the court explained that latent claimants whose claims were discharged by the bar date with insufficient notice were entitled under the bankruptcy rules to post-confirmation process:

> It is entirely possible that an unmanifested claimant may bring a claim after the bar date, argue the Debtors' notice scheme was unconstitutional, as applied to her, and be correct in that argument. She would have her claim reinstated and the Debtors would then be free to dispute its validity and/or her damages. But that is a retrospective determination, an unconstitutional, as applied, determination.

JA 871. In short, on the clear condition that a path to relief consistent with due process would remain available to latent claimants, the Bankruptcy Court confirmed the plan, formally "consummat[ing]" the EFH-Sempra merger, JA 49, and the Confirmation Order formally discharged all claims against the reorganized EFH that were not filed before the bar date.[1]

Notwithstanding the extension available under Rule 3003(c)(3) and the assurance that the post-confirmation procedure would comport with due process, Appellants—latent claimants who did not file by the bar date and were subsequently stricken with mesothelioma—appealed the

---

[1] EFH quite candidly acknowledged at oral argument that "conceivably those [discharged] claims could be all allowable claims," reinstated on a case-by-case basis, through the Rule 3003(c)(3) procedure. Tr. 47.

12

Confirmation Order's discharge of their claims on due process grounds. The District Court dismissed the appeal without reaching its merits, reasoning that it was barred by 11 U.S.C. § 363(m), commonly referred to as the "statutory mootness" provision, *see, e.g.*, *Cinicola v. Scharffenberger*, 248 F.3d 110, 122 (3d Cir. 2001), which provides that a party may not seek the "reversal or modification on appeal of an authorization . . . of a sale or lease of property [that] affect[s] the validity of a sale" unless the sale order is stayed, 11 U.S.C. § 363(m). Appellants now seek our review, which is plenary.[2]

## II. Discussion

Although presented as a single claim, Appellants' due process challenge, on inspection, presents two distinct and alternative arguments: first, that Appellants were entitled to partake of the pre-discharge claims process by having all latent claims deemed timely filed and by recovering through a § 524(g) trust or its equivalent; and second, that to the extent Rule 3003(c)(3) was incorporated as a term of the Confirmation Order, it is facially unconstitutional because that term is categorically incapable of affording due process to any

---

[2] The Bankruptcy Court had jurisdiction under 28 U.S.C. §§ 157(a) and 1334(b), the District Court had appellate jurisdiction under 28 U.S.C. § 158(a), and we have appellate jurisdiction under 28 U.S.C. §§ 158(d) and 1291. Our review of a District Court sitting in review of a Bankruptcy Court is plenary. *In re W.R. Grace & Co.*, 729 F.3d 311, 319 n.14 (3d Cir. 2013). We review the Bankruptcy Court's legal conclusions de novo and its factual findings for clear error. *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139 (3d Cir. 2012).

13

latent claimant.[3]  But before we can engage the merits of either argument, we must contend with the three threshold objections raised by EFH: (a) that Appellants' due process claim is not ripe; (b) that it was not timely appealed; and (c) that, as the District Court concluded, it was statutorily moot under 11 U.S.C. § 363(m).  We address these issues in turn.

## A. Ripeness

We begin with the "threshold issue" of ripeness.[4]  *In re Johnson-Allen*, 871 F.2d 421, 423 (3d Cir. 1989).   EFH contends that this appeal is unripe because Appellants have not yet sought relief under the post-confirmation process outlined

---

[3] As is implicit in the briefs and made explicit at oral argument, Appellants are not making an as-applied challenge; rather, they contend that Rule 3003(c)(3) is a categorically insufficient "mechanism" for addressing the due process issue. Tr. 74.

[4] In addition to contesting ripeness as to Appellants Jones, Heinzmann, and Bergschneider, EFH challenges the justiciability of this appeal on the ground that two other Appellants, Fenicle and Fahy, lack standing because they timely filed proofs of claim.  Be that as it may, however, only one appellant must have standing for a case to be justiciable, *Horne v. Flores*, 557 U.S. 433, 446 (2009), and EFH does not dispute the standing of the remaining Appellants.  *See Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977) ("We conclude that [one] appellee . . . has the requisite standing and therefore have no occasion to decide the standing of the other appellees.").

by the Bankruptcy Court.  We disagree that this fact renders the appeal unripe.

A case is ripe when it is fit for judicial decision and further withholding of our consideration would cause the parties hardship.  *In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 307 (3d Cir. 2000).  To determine whether this standard is met, we ask whether the parties are "sufficiently adversarial," the appellants "genuinely aggrieved," and the issues appropriately "crystallized."  *Jie Fang v. Dir. U.S. ICE*, 935 F.3d 172, 186 (3d Cir. 2019) (citation omitted).  Applying these factors, we conclude that the due process arguments raised by Appellants are plainly ripe for our review.

The first two factors are easily resolved:  There is no question that the parties are "sufficiently adversarial" where they have litigated aggressively throughout the five-year bankruptcy proceeding, and continue to take conflicting positions with respect to the issues involved in this appeal; nor is there any doubt that Appellants, who are each affected by asbestos-caused mesothelioma—a fast-acting and invariably fatal form of cancer—are "genuinely aggrieved."

That leaves the question whether the arguments raised by Appellants are appropriately "crystallized," i.e., whether "the facts of the case [have been] sufficiently developed to provide the court with enough information on which to decide the matter conclusively."  *Jie Fang*, 935 F.3d at 186 (quoting *Peachlum v. City of York*, 333 F.3d 429, 433–34 (3d Cir. 2003)).  As to both issues, the answer is "yes."  The first issue presented by Appellants—whether Appellants were entitled to pre-confirmation process—turns simply on our analysis of whether the lack of notice to or inadequate representation of latent claimants before the discharge violated due process.  No

15

facts are left to be developed on this issue because the discharge has already been consummated, furnishing us with "enough information" to "decide the matter conclusively."

The second issue—whether, assuming some post-confirmation process could comport with due process, the particular process provided here is on its face sufficient—is also accompanied by "enough information" to be "crystallized" for our review. The Bankruptcy Court described a post-confirmation process by which Appellants would be able to seek reinstatement of their claims upon a showing that they were individually deprived of due process, and the description it provided supplies "enough information" to determine whether that process, at least as a facial matter, would conform with due process. EFH complains that Appellants have not yet sought to avail themselves of that post-confirmation process, but while that objection might have traction for an as-applied challenge, such additional steps are not necessary for a facial challenge, unless the challenger's actual "need for [process] is speculative," *Artway v. Att'y Gen.*, 81 F.3d 1235, 1252 (3d Cir. 1996), or where a new statute is to be applied in a way we cannot apprehend in advance, *Phila. Fed'n of Teachers v. Ridge*, 150 F.3d 319, 324 (3d Cir. 1998).

Neither scenario is presented here. Appellants, already affected by mesothelioma, have an immediate "need for" whatever process is available to vindicate their claims for damages, and we can sufficiently apprehend how the post-confirmation process here—i.e., motions for reinstatement under Rule 3003(c)(3)—is to be applied. Accordingly, the appeal is ripe.

16

## B. Timeliness

EFH next asserts that the appeal constitutes an improper collateral attack on the order rejecting the latent claimants' objections and holding untimely filers to the bar date. Per EFH, that order could have been appealed but was not; therefore, EFH tells us, we should hold that any appeal of that aspect of the Confirmation Order is barred.

Our analysis of this issue is guided by the Court's recent decision in *Ritzen Group, Inc. v. Jackson Masonry, LLC*, No. 18-938, 2020 WL 201023 (U.S. Jan. 14, 2020).[5] In *Ritzen*, the Court unanimously held that because "the adjudication of a motion for relief from [an] automatic stay forms a discrete procedural unit within the embracive bankruptcy case," it constituted "a final, appealable order when the bankruptcy court unreservedly grants or denies relief." *Id.* at *2. That holding abrogated out-of-Circuit precedent to the contrary, *see In re Frontier Properties, Inc.*, 979 F.2d 1358, 1364 (9th Cir. 1992) ("[W]here an issue is determined in an interlocutory order and later incorporated into a final order, the determination of the original issue is appealable upon an appeal of the final order."), and confirmed the premise of EFH's argument: that the failure to appeal a bankruptcy court's final, appealable order renders a later appeal of the issue embedded in a subsequent order untimely. *See Ritzen*, 2020 WL 201023, at *7. The question, then, is whether the order denying latent

---

[5] As *Ritzen* was decided after this case was briefed and argued, the parties were invited to and did submit supplemental briefing on its significance for this case.

17

claimants' motion in opposition to the bar date constituted a final, appealable order for purposes of *Ritzen*.[6]

It does not. A final order in bankruptcy, *Ritzen* instructs, is one that "disposes of a procedural unit anterior to, and separate from, claim-resolution proceedings." *Id.* at *5. As the Supreme Court described it, such a separate procedural unit, like the stay-relief proceedings at issue in *Ritzen*, generally "initiates a discrete procedural sequence, including notice and a hearing"; requires application of a "statutory standard"; and does "not occur as part of the adversary claims-adjudication process." *Id.*

While EFH's motion to establish a bar date initiated a procedural sequence, including notice and hearing, it does not satisfy the remaining elements of the *Ritzen* finality standard. There was no "statutory standard" to govern the question of whether the bar date should apply to latent claimants—instead, the Bankruptcy Court relied on general principles of due process. And the bar date dispute was not anterior to and separate from, but instead was intertwined with and directly concerned, the claims processing provided by the plan confirmation. For these reasons, the bar date orders were not final and appealable, *see In re Hooker Invs., Inc.*, 937 F.2d 833, 837 (2d Cir. 1992) (holding that bar date order was not final order), and Appellants were entitled to await plan confirmation to raise their objections as part of this appeal.

---

[6] The opposition to EFH's motion to impose a bar date was filed by a group of plaintiffs' law firms, purportedly on behalf of all latent claimants. While the Bankruptcy Court noted the firms' apparent lack of standing, it adjudicated the dispute on its merits.

18

## C. Statutory Mootness

The third and last procedural bar invoked by EFH (and the one accepted by the District Court) is also the most difficult to resolve. EFH contends that this appeal is barred by 11 U.S.C. § 363(m), and the District Court agreed to dismiss the appeal on that basis. Appellants make three retorts: first, that we should recognize a due process exception to § 363(m); second, that the Confirmation Order was not an "authorization . . . of a sale" for purposes of § 363(m); and third, that relief for Appellants would not "affect the validity" of the sale. We answer each below.

### 1. Is there a due process exception to § 363(m)?

Appellants' first argument—that there is a due process exception to § 363(m)—is the easiest to dispatch: There is not. Certainly, no such exception is found in the text of § 363(m). *See* 11 U.S.C. § 363(m). So the exception would have to come from a case, or at least from settled principles in our case law.

The case law, however, is equally devoid of support for a due process exception. The two cases upon which Appellants rely for their proposed exception are *Hansberry v. Lee*, 311 U.S. 32 (1940), and *INS v. St. Cyr*, 533 U.S. 289 (2001). Neither can bear that weight. *Hansberry* held that a plaintiff was deprived of due process when he was bound by a class action to which he was not a party, 311 U.S. at 42–46; *St. Cyr* held that a jurisdictional statute should be construed narrowly to avoid raising serious questions regarding its constitutionality under the Suspension Clause, *see* 533 U.S. at 313–14. No doubt, both dealt with due process challenges to statutes barring appeal, but the gravamen of those challenges was that the plaintiffs would never have an opportunity to present their

19

underlying merits claims to any federal court if the statutory bar applied to their cases.

Appellants' position is quite different.  They had the opportunity to present their merits claims in the Bankruptcy Court and lost.  They could have sought to stay the sale to preempt any objections regarding § 363(m); they opted not to do so.  They now ask us, assuming the other § 363(m) requirements apply, to excuse that failure because their merits claim happens to be a due process claim.  Neither *Hansberry* nor *St. Cyr* remotely stands for that proposition.  Due process claims do not receive special exemptions from the applicability of procedural requirements for the filing of appeals.  To the contrary, we regularly confront due process or other serious constitutional claims by habeas litigants, for instance, who face the unparalleled penalties of death or incarceration.  Yet we apply strict procedural requirements when they bring their claims in that context.  *E.g.*, *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).

Of course, there are exceptions to every rule—including procedural ones.  Thus, we might excuse § 363(m)'s requirements if Appellants' underlying claim, due process or otherwise, had never been heard at all, as in *Hansberry* and *St. Cyr*.  And we might, too, excuse § 363(m)'s requirements if there were a compelling cause outside of Appellants' control for their violation of the rule, as there was in *Martinez*, *see* 566 U.S. at 10–11.  But neither scenario is presented here.  Rather, § 363(m), assuming its applicability, permitted Appellants to bring their claims in federal court if they complied with the stay requirement, and Appellants have not presented a compelling

reason to excuse their failure to do so.[7]  We therefore decline to recognize Appellants' proposed "due process exception" to § 363(m).

> 2. Was the Confirmation Order an "authorization . . . of a sale"?

Appellants next assert that the Confirmation Order they are appealing was not "an authorization . . . of a sale" under § 363(m).  They offer two arguments as to why the Confirmation Order is not within § 363(m)'s ambit.  Neither is persuasive.

Appellants' first argument is that there can be only one discrete order that qualifies as an authorization of a sale within the meaning of § 363(m), and here, that would be the earlier Bankruptcy Court order (the "Merger Order") which held the merger authorized under the Bankruptcy Code—not the Confirmation Order on which the Merger Order was

---

[7] Appellants argue—though only in the introduction to their opening brief—that they should be excused from the stay requirement, in the alternative, because they could not have afforded the bond necessary to obtain a stay.  This argument is perhaps colorable in theory, insofar as it evokes the principle that constitutional rights cannot be conditioned on wealth.  *See Bearden v. Georgia*, 461 U.S. 660, 672–73 (1983).  But Appellants did not even attempt to obtain a stay, and we are therefore unable to determine whether a bond would have been required or whether Appellants could have afforded one.  Appellants' speculation as to the cost of securing a stay could not excuse them from seeking one at all, if it were required.

conditioned. A similar argument, however, was resolved against Appellants in a closely analogous case.

In *Cinicola v. Scharffenberger*, 248 F.3d 110, 122 (3d Cir. 2001), we considered an appeal by physicians who challenged the assignment of their contracts during a healthcare corporation's bankruptcy proceedings. *See* 248 F.3d at 115. The physicians had been under contract with subsidiaries of the bankrupt corporation, and the corporation's bankruptcy trustee sought approval of a settlement agreement that both "involved the sale of assets" and "provided for the assignment of the physicians' employment contracts." *Id.* at 116. The Bankruptcy Court entered an order approving the sale but deferred decision on the assignment of the physicians' contracts. *Id.* at 117. Subsequently, it entered a second order authorizing the contract assignment. *Id.* When the physicians appealed that second order without seeking a stay, the trustee argued, as EFH does here, that the appeal was barred by § 363(m), and we agreed. *Id.* at 117–18, 126.

While the physicians argued that the second order "represented an independent act," we disagreed. *Id.* at 126. We concluded that it was "clear the Bankruptcy Court intended its Second Order to operate in conjunction with its First Order," *id.* at 125–26, and that the second order was therefore "inextricably intertwined with [the] sale of assets," *id.* at 126.

Here, we have little trouble concluding that the Confirmation Order and the Merger Order were likewise "inextricably intertwined." The merger agreement expressly provided that closing would take place only after entry of the Confirmation Order, and the Confirmation Order by its terms "authorized and directed" EFH and Sempra to "consummate" the merger, JA 49, and recognized Sempra as a good-faith

22

purchaser within the meaning of § 363(m). In sum, as in *Cinicola*, it is "clear the Bankruptcy Court intended its Second Order to operate in conjunction with its First Order." We therefore reject Appellants' argument that they are not appealing the "authorization . . . of a sale" for purposes of § 363(m).

Appellants next contend that § 363(m) does not apply because the specific provision of the Confirmation Order with which they take issue—the discharge of latent claims and provision for post-confirmation relief—does not authorize the sale. But Appellants "do[] not cite any authority that would allow us to perform this isolated analysis." *In re Sneed Shipbuilding, Inc.*, 916 F.3d 405, 410 (5th Cir. 2019). And dissecting the Confirmation Order in this fashion seems particularly inappropriate where that order expressly provides that every "term and provision of the Plan" and of "the Merger Agreement" was "nonseverable and mutually dependent," JA 78–79, and where the record suggests that Sempra bargained for and relied upon the discharge of untimely claims in favor of a post-confirmation process. Because Appellants challenge a provision of the Confirmation Order that was both formally and practically bound up with the sale authorization, we will follow our general rule that "any reasonably close question about the applicability of § 363(m) should be answered in favor of applicability," *In re Pursuit Capital Mgmt., LLC*, 874 F.3d 124, 134 (3d Cir. 2017), and conclude that Appellants do appeal an "authorization . . . of a sale."[8]

---

[8] Appellants point out our cautionary note that § 363(m) "does not moot *every* term that might be included in a sale agreement, even if each is technically integral to that transaction." *In re ICL Holding Co.*, 802 F.3d 547, 554 (3d

3. Would the requested relief "affect the validity of [the] sale"?

We turn to the final requirement to trigger § 363(m)'s bar: whether the appeal would "affect the validity of [the] sale." To answer this question, we must draw from and therefore briefly review our § 363(m) jurisprudence.

We typically refer to § 363(m) as a rule of "statutory mootness." *E.g.*, *Cinicola*, 248 F.3d at 124. In many circuits, the "mootness" label is an apt one because § 363(m) is read essentially as a jurisdictional bar against any appeal of an unstayed sale order. *See, e.g.*, *In re Gucci*, 105 F.3d 837, 839–40 (2d Cir. 1997) (limiting the court's inquiry "to the issue of good faith"). But in our Circuit, "mootness" is a bit of a misnomer because we have construed § 363(m) as a constraint not on our jurisdiction, but on our capacity to fashion relief. *Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc.*, 141 F.3d 490, 498–99 (3d Cir. 1998). This interpretation, while a minority one, is for us well settled and consistent with the views of the Sixth and Tenth Circuits. *See In re Brown*, 851

Cir. 2015) (internal quotation marks and citation omitted). But we made this remark not in assessing whether a given document constituted an "authorization . . . of a sale," but whether we could grant relief that would "affect the validity of a sale" under § 363(m), *see id.*—a separate inquiry to which we next turn. It is quite sensible to construe broadly the *applicability* of § 363(m) to "promote the finality of sales" in furtherance of Congress's intent, *see Pursuit Capital*, 874 F.3d at 133, but to ensure that it is not *actually applied* to individual challenges that are so minor as to not affect that finality interest, *see ICL Holding*, 802 F.3d at 554. We deal here only with the initial question of applicability.

F.3d 619, 623 (6th Cir. 2017); *In re C.W. Mining Co.*, 641 F.3d 1235, 1239–40 (10th Cir. 2011). It is also, we believe, the correct one, for the provision by its terms forbids only those appeals that "affect the validity of a sale," not all those that call into question any aspect of such a sale. *See ICL Holding*, 802 F.3d at 554.

Our task, then, after ascertaining that the appeal is from an authorization of a sale, that the purchase was made in good faith, and that the sale was not stayed, is to "see whether a remedy can be fashioned that will not affect the validity of the sale." *Krebs Chrysler-Plymouth*, 141 F.3d at 498–99. To be sure, demonstrating the availability of such relief "is a high bar." *Pursuit Capital*, 874 F.3d at 139. The ultimate question is whether the grant of relief would, in effect, "claw back the sale," *ICL Holding*, 802 F.3d at 554, so a challenger seeking to avert § 363(m)'s bar must demonstrate that the relief affects only "collateral issues not implicating a central or integral element of a sale," *Pursuit Capital*, 874 F.3d at 139. While requested relief that would materially increase or decrease the purchase price would plainly affect the validity of the sale, *see Pittsburgh Food & Beverage, Inc. v. Ranallo*, 112 F.3d 645, 649 (3d Cir. 1997), other requested relief may require more careful study depending on the nature of the claim and the type of relief sought, *see, e.g.*, *ICL Holding*, 802 F.3d at 554 (holding in the context of contested rights to an escrow that reallocating the purchase funds among creditors does not affect the validity of the sale).

With these principles in mind, we turn to Appellants' two due process arguments, each of which would entail a different type of relief and thus must be analyzed separately.

Appellants' first argument is that they are entitled to the same treatment as creditors who timely filed proofs of claim, such that their claims must be held to have been "not discharged" and "retained against the debtors," Tr. 70, and EFH must establish the equivalent of a § 524(g) trust to administer disbursements.[9] Ordering such relief would plainly affect the validity of the sale. Sempra planned carefully for the amount and the character of the debt, the intercompany relationships, and the associated tax implications that would accompany its present asbestos liability, in contrast with its potential future liability under a post-confirmation process. Allowing latent claims for which no proof of claim was filed to be retained and establishing the equivalent of a § 524(g) trust would fundamentally alter those expectations. Specifically, a blanket allowance of latent claims would increase Sempra's purchase price by exposing it to present asbestos liability it did not bargain for, rather than to the future liability for which it did. And under *Pittsburgh Food & Beverage* and its progeny, an alteration of the price term would "affect the validity of the

---

[9] Appellants rely for this proposition on *Connecticut v. Doehr*, 501 U.S. 1 (1991), which required pre-deprivation process because even a "temporary deprivation"—a prejudgment attachment that "cloud[ed] title [and] impair[ed] the ability to sell"—caused permanent loss. *Id.* at 11, 15. But in other cases, like *Zinermon v. Burch*, 494 U.S. 113 (1990), post-deprivation process is particularly appropriate because it is "impossible for the State to predict such deprivations and provide predeprivation process." *Id.* at 129. Here, we note that it would have been "impossible" for the Bankruptcy Court to "provide predeprivation process" because, at the time of the bar date, unmanifested claimants were unknown—in Appellants' words—"even to themselves," Appellants' Br. 24.

sale." 112 F.3d at 649–50. We are therefore barred by § 363(m) from reaching Appellants' argument that they were entitled to pre-confirmation process.

We take a different view, however, of Appellants' second argument, that Rule 3003(c)(3)'s claim reinstatement procedure is incapable of providing due process to latent claimants, rendering this term of the Confirmation Order facially unconstitutional. Because, as EFH concedes, a fair post-confirmation process was contemplated by the plan of reorganization, to which Sempra agreed by effectuating the merger, our review of whether Rule 3003(c)(3) can provide fair process could not conceivably "affect the validity of the sale," *see Krebs*, 141 F.3d at 498–99; it was part and parcel of the sale. Section 363(m) thus poses no bar to our review of whether the post-confirmation process anticipated by the Confirmation Order, i.e., Rule 3003(c)(3), is facially inadequate to afford due process to latent claimants. We turn now to that sole surviving argument.

### D. Due Process

To show that this aspect of the Confirmation Order is facially unconstitutional, Appellants must establish both a deprivation of an "individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property" and the absence of procedures that "provide due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (internal quotation marks and citation omitted). But as we explain below, while Appellants' due process claim undoubtedly satisfies the first component, it falls short on the second because the combination of notice and hearing available to them is constitutionally adequate.

At the first step, Appellants have demonstrated a deprivation of a protected interest. We have recognized as a protected property interest the ability to pursue an asbestos claim. *See Grossman's*, 607 F.3d at 127. Because Appellants challenge the post-confirmation process as depriving them of their ability to pursue their asbestos claims, they have asserted a cognizable property interest within the protection of the Due Process Clause.

We must then ask, in connection with this protected interest, "what process the State provided, and whether it was constitutionally adequate." *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 138 (3d Cir. 2010) (citation omitted). This inquiry is more searching: It "examine[s] the procedural safeguards built into the statutory or administrative procedure of effecting the deprivation, and any remedies for erroneous deprivations provided by statute." *Id.* (alteration in original) (citation omitted). Although the appropriate safeguards are "dictated by the particular circumstance," *Rogal v. Am. Broad. Cos.*, 74 F.3d 40, 44 (3d Cir. 1996) (citation omitted), the standard safeguards are some form of "notice and a hearing," *Wilson v. MVM, Inc.*, 475 F.3d 166, 178 (3d Cir. 2007). Here, the combination of both the pre-confirmation notice provided and the post-confirmation hearing available are adequate.

As for pre-confirmation notice, Appellants do not dispute that they received publication notice prior to the bar date. EFH launched a multimillion-dollar notice plan to contact latent claimants and notify them of the impending bar date and the accompanying need to file a proof of claim. All latent claimants who timely filed proofs of claim—and there were nearly 10,000 such claimants—were assured of retaining their ability to pursue their claims and, contrary to Appellants' argument that actual notice to all potential claimants was

28

required, claimants who were unknown at the time of the discharge—such as Appellants—were entitled only to publication notice of a property deprivation, *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 317–18 (1950). We are also unpersuaded that EFH was not "desirous of actually informing" latent claimants of the bar date, *id.* at 315; to the contrary, it employed a noticing expert, "follow[ed] the principles in the Federal Judicial Center's . . . illustrative model forms of plain language notices," JA 392, and published notice in seven consumer magazines, 226 local newspapers, three national newspapers, forty-three Spanish-language newspapers, eleven union publications, and five Internet outlets. Under our case law, that publication was sufficient. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 348–49 (3d Cir. 1995) (holding that publication in two national newspapers and seven local newspapers was constitutionally sufficient).

As for the post-confirmation hearing available to latent claimants, again due process is satisfied. The Bankruptcy Court retains jurisdiction over the parties to consider whether it unconstitutionally discharged individual claims, *see In re W.R. Grace & Co.*, 900 F.3d 126, 138–39 (3d Cir. 2018), and as EFH agrees, the Bankruptcy Court must accept late-filed proofs of claim under Federal Rule of Bankruptcy 3003(c)(3) for "cause shown." Fed. R. Bankr. P. 3003(c)(3). That "flexible" standard is met when the "danger of prejudice to the debtor" is low; the claimant shows good "reason for the delay"; and the "length of the delay" does not have outsize "impact on [the] judicial proceedings." *Pioneer Inv. Servs.*, 507 U.S. at 389, 395 (applying "excusable neglect" standard of Fed. R. Bankr. P. 9006 to Rule 3003(c)(3)). Our review of these three factors convinces us that deserving latent claimants will have adequate opportunity to obtain reinstatement through Rule

3003(c)(3) motions and that this path to relief is not, as Appellants assert, categorically incapable of affording due process to latent claimants.[10]

First, all latent claimants will have the opportunity to show that reinstatement of their claims would pose no "danger of prejudice" to the debtors here. As we have explained, the prospect of a post-confirmation procedure allowing for reinstatement was baked into the merger agreement, and Rule 3003(c)(3) provides that procedure. Reinstatement of latent claims under Rule 3003(c)(3) thus would appear not to not alter the expectations the parties had at the time they agreed to the merger.

Second, latent claimants will have the opportunity to demonstrate a "reason for the delay" by showing that they would otherwise be deprived of due process under *Grossman's*. As we made clear in that case, a latent claim cannot be constitutionally discharged if the claimant received inadequate "notice of the claims bar date"—a concern that "arise[s] starkly in the situation presented by persons with asbestos injuries that are not manifested until years or even decades after exposure," *Grossman's*, 607 F.3d at 126, because "persons in the exposure-only category . . . may not even know of their exposure," may not "realize the extent of the harm they may incur," or "[e]ven if they fully appreciate the significance of [notice they did receive], . . . without current afflictions[,]

_____

[10] We hold today that Rule 3003(c)(3) is not categorically incapable of providing due process so that the post-confirmation process anticipated by the Confirmation Order is not facially unconstitutional. We do not foreclose an as-applied challenge by any latent claimant who contends that he did not, in fact, receive due process.

may not have the information or foresight needed to decide, intelligently, whether [to file a claim]," *Amchem,* 521 U.S. at 628. For that reason, we identified in *Grossman's* factors bearing on the "adequacy of the notice of the claims bar date," 607 F.3d at 127, including—with particular relevance for the Rule 3003(c)(3) proceedings we consider today—"whether the notice of the claims bar date came to [the claimants' attention]," "whether and/or when the claimants were aware of their vulnerability to asbestos," and "whether the claimants had a colorable claim at the time of the bar date," *id.* at 127–28. Thus, latent claimants will have a chance to argue based on those factors that the permanent discharge of their respective claims would not comply with due process under *Grossman's*—undoubtedly an adequate "reason for the delay"—and obtain reinstatement under Rule 3003(c)(3).

Finally, while the "length of the delay" between the bar date and latent claimants' Rule 3003(c)(3) motions will be substantial, latent claimants will not be precluded from arguing that the delay had no "impact" on EFH's bankruptcy proceedings because those proceedings concluded with the Confirmation Order so this factor, too, cuts in favor of granting their Rule 3003(c)(3) motions.

In sum, our excursion through the Rule 3003(c)(3) factors convinces us that the Rule is capable of providing latent claimants with a fair opportunity to seek reinstatement. It allows them to argue that their late filings would impose no prejudice on EFH and that the length of their delay would not affect any bankruptcy proceeding.[11] It likewise allows them to

---

[11] We have not independently discussed the final Rule 3003(c)(3) factor, good faith, *see Pioneer Inv. Servs.*, 507 U.S.

31

argue that, without reinstatement, they would not be accorded due process under *Grossman's*. This showing is only negligibly more demanding than the one necessary to file a proof of claim before the bar date—it requires that latent claimants allege a single additional fact, i.e., lack of due process under *Grossman's*, and this one additional requirement does not render the Rule 3003(c)(3) process unconstitutional.

Appellants also object that the procedural barriers to obtaining Rule 3003(c)(3) relief necessarily deprive them of due process. But obtaining such relief is in fact quite simple—especially as courts must accord "special care" to pro se claimants, *see Mathewson v. Mathewson*, 311 F.2d 833, 833 (3d Cir. 1963), "liberally constru[ing]" their filings and holding them "to less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (citation omitted)—meaning that none of Appellants' logistical concerns holds weight.

It is true, as Appellants point out, that they must "carry the burden of proof" under Rule 3003(c)(3), Appellants' Br. 32, but that burden for these latent claimants is a light one: Appellants need only file a basic motion reciting the fact that reinstatement of their claim will neither prejudice EFH nor impact its bankruptcy proceedings and attach a sworn affidavit explaining why they were deprived of due process under *Grossman's*. *See Pioneer Inv. Servs.*, 507 U.S. at 384. And while Appellants express concern that Rule 3003(c)(3) motions will be processed slowly so recoveries will be unfairly delayed, we are confident that the Bankruptcy Court will resolve those motions swiftly given the relatively simple showing required

at 395, but we note that the application of that requirement to bar any bad-faith latent claims would not offend due process.

32

to obtain relief and the sensitivity the Bankruptcy Court has shown to the crippling and fast-acting nature of asbestos-related diseases.[12]

Finally, though Appellants note their concern that any added delay in reinstatement might reduce the quantum of potential damages they recover, that concern relies upon a patent misreading of a single state's damages statute. *Compare* Appellants' Br. 32 (interpreting Cal. Civ. Proc. Code § 377.34 as providing that damages "do not survive the death of the injured party") *with* Cal. Civ. Proc. Code § 377.34 (providing that damages are "limited to the loss or damage that the decedent sustained or incurred before death").

In all, then, Rule 3003(c)(3) is capable of affording latent claimants a fair opportunity post-confirmation to seek reinstatement of their claims, and we reject Appellants' due process challenge to that aspect of the Confirmation Order.

\* \* \*

---

[12] Appellants are also protected by the fact that the statutes of limitations applicable to asbestos claims generally run from the date of diagnosis, *see, e.g.*, *In re Asbestos Litig.*, 673 A.2d 159, 162 (Del. 1996); *Lapka v. Porter Hayden Co.*, 745 A.2d 525, 553–54 (N.J. 2000); *Abrams v. Pneumo Abex Corp.*, 981 A.2d 198, 210–11 (Pa. 2009), and are often applied flexibly, *see, e.g.*, *Mergenthaler v. Asbestos Corp. of Am.*, 500 A.2d 1357, 1365 (Del. Super. Ct. 1985); *Wanner v. Philip Carey Mfg. Co.*, 580 A.2d 734, 736–37 (N.J. Super. Ct. App. Div. 1989); *Mihalcik v. Celotex Corp.*, 511 A.2d 239, 244–45 (Pa. Super. Ct. 1986).

Though we decline to upset the approach taken here, we share the Bankruptcy Court's "regret" that "the debtors asked for [a bar date] in the first place," both because the bar date might "adversely affect . . . [claimants] who have manifested injury . . . or will manifest injury based on prepetition exposure who have not filed proofs of claim" and because it "led to a lot of litigation and a lot of expense and a $2 million noticing program." JA 1631. Indeed, this case serves as a cautionary tale for debtors attempting to circumvent § 524(g). The alternative route EFH has chosen for addressing its asbestos liability has produced a similar result as a § 524(g) trust— reimbursement for latent claimants who either filed proofs of claim or did not receive proper notice of the bar date—but with added and unnecessary back-end litigation. Like the Bankruptcy Court, however, we have only "a limited role" in this case. JA 1630. We are not charged with ensuring that EFH's strategic choices were optimal or even advisable; we are merely asked to ensure that they satisfy the Bankruptcy Code and the Constitution. And in this limited role, we conclude that the post-confirmation process described above satisfies both.

## III. Conclusion

For the foregoing reasons, we will affirm.

34